UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

SMITH A. CARDIN,                              :
              Plaintiff,                      :
                                              :
       v.                                     :        C.A. No. 13-170ML
                                              :
CAROLYN W. COLVIN,                            :
Acting Commissioner of the Social Security    :
Administration,                               :
              Defendant.                      :

# REPORT AND RECOMMENDATION

Patricia A. Sullivan, United States Magistrate Judge

       Plaintiff Smith A. Cardin ("Plaintiff") contends that her longstanding mental impairments

have resulted in a life of chaos punctuated by short-lived attempts to work, many of which failed

because of fights or arguments triggered by her limitations.  This is Plaintiff's fifth attempt to

secure Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under

§§ 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3).  Each of

her four prior applications were denied, the last as of August 18, 2008.  In this proceeding,

Plaintiff seeks reversal of the Commissioner of Social Security's (the "Commissioner") decision

that denied her fifth application and declined to reopen the prior applications.  She contends that

the determination of the administrative law judge ("ALJ") that her mental impairments are not

disabling was infected by errors of law and not supported by substantial evidence.  Defendant

Carolyn W. Colvin ("Defendant") has filed a motion for an order affirming the Commissioner's

decision.

       These motions have been referred to me for Report and Recommendation.  I find that the

ALJ's refusal to reopen any of the four prior applications was properly based on the lack of new

and material evidence to justify reopening; more importantly, because Plaintiff has failed to present a colorable constitutional challenge to the ALJ's decision, particularly where she was represented by competent legal counsel in connection with at least the third and fourth of the denied applications, this Court does not have jurisdiction to review the denial of reopening. I further find no error in the ALJ's conclusion that the RFC opinions of Plaintiff's mental health treating sources are not entitled to probative value and that the ALJ's residual functional capacity determination is well supported by substantial medical evidence. Accordingly, I recommend that Plaintiff's Motion to Reverse or Remand Commissioner's Decision (ECF No. 9) be DENIED and that the Commissioner's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 11) be GRANTED.

## I.    Background Facts

Smith Ann Cardin, born in 1970, was thirty-four on September 20, 2004, the alleged date of onset of disability and thirty-eight on August 18, 2008, the final denial date of her fourth application. Tr. 15, 18, 155. She completed high school and attended some college, obtaining an EMT certification. Tr. 35-36, 655. At the time of the September 2011 hearing, she was living with her fiancé and eleven year old son from a prior relationship, who has special needs and receives disability benefits. Tr. 34, 36, 158, 164. From 1994 until 2008, Plaintiff worked, mostly at part-time jobs, including as a salesperson, cashier, telemarketer, limousine driver and homecare provider, annually earning between $3,000 and $5,500. Tr. 166-67, 246, 264. In 2003, she earned $9,500 working as an assistant manager at a storage facility. Tr. 51, 168, 178-81, 187. Medical reports indicate that she chose to work part-time to be able to care for her disabled son. Tr. 327, 351. According to her testimony, each of her last four jobs ended due to

an altercation with a supervisor. Tr. 42-44, 51-53. She has not worked at all since February 2008. Tr. 36.

Important background in Plaintiff's medical history is her diagnosis as HIV positive in 1993 and a mental "breakdown" that resulted in a nine-day hospitalization at Butler Hospital in September 2004, the alleged onset of disability. Tr. 351. In connection with the current applications, her alleged impairments include both mental and physical maladies: her claimed mental conditions are major depressive disorder, general anxiety disorder, panic disorder, a possible personality disorder and substance abuse disorder in remission, while her physical ailments include fatigue related to HIV medication, fatigue related to restless leg syndrome, severe respiratory condition, right hand spasm and left hand abnormality (arm and hand pain), history of possible mild right sided carpal tunnel syndrome and right lower extremity neuropathy (foot pain). Tr. 18-19, 79, 155-63, 263. Despite her alleged physical impairments, the gravamen of Plaintiff's claims, and the only issue that she raises in this Court, is her claim of disability due to mental impairments.

### A. Prior Disability Applications

Plaintiff has submitted at least four prior disability applications, all of which were denied. The first and second covered periods prior to her current alleged onset date. See Tr. 184, 260, 320. The third and fourth alleged the same onset of disability, September 20, 2004, as her fifth (current) application. Tr. 83, 85, 87-88, 96, 220, 225, 647, 673. Plaintiff was represented by counsel (the same attorney who is representing her on the current application) for her third application, where she alleged disability based on HIV and affective disorders; it was denied on October 15, 2006, at "Reconsideration or FedRO Review." Tr. 83-86, 96, 183, 221, 437, 614. Plaintiff was represented by the same attorney on her fourth application, which alleged disability

based on affective disorders, HIV, bilateral carpal tunnel and restless leg syndrome; it was denied at the initial level on August 18, 2008, and not pursued further. Tr. 87-88, 99-100, 104, 220, 225, 647, 673.

### B. Mental Health History from Onset (September 20, 2004) until Denial of Fourth Application (August 18, 2008)

Unless the prior applications are reopened, Plaintiff is barred from relitigating the Commissioner's denial of her claim of disability from September 20, 2004, through the final determination of ineligibility on August 18, 2008. 20 C.F.R. ¶ § 404.957(c)(1);[1] see Navan v. Astrue, 303 F. App'x 18, 20 (2d Cir. 2008) (administrative *res judicata* appropriately applied when prior determination on same time period final by either administrative or judicial action); Girard v. Chater, 918 F. Supp. 42, 44 (D.R.I. 1996) (same). Accordingly, Plaintiff's medical history from this period has limited relevance to the current applications, except to the extent that it bears on her challenge to the ALJ's refusal to reopen or to the extent that medical evidence from the closed period is relevant to her alleged limitations during the period under adjudication after August 18, 2008. With these limits in mind, I lay out a summary of her medical history, from this period, focusing on her mental health.

Plaintiff's admission to Butler Hospital in September 2004 was triggered by depression, but she responded positively to medication, her mood and anxiety improved and she was discharged with a "good" prognosis. Tr. 351-53, 361, 362. From late 2004 until early 2006, she received outpatient mental health treatment; her mood was generally described as "stable," she had a good response to medications, and she reported both to her psychologist and primary care physician that she was doing well except for stress associated with caring for her disabled son.

---

[1] The Social Security Administration has promulgated identical sets of regulations governing eligibility for DIB and SSI. See McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118, 1120 n.1 (1st Cir. 1986). For simplicity, I cite to one set only. See id.

Tr. 327, 329, 334-48, 407, 412, 418, 508-09, 512, 515-19. An extensive neuropsychological evaluation performed by her treating psychologist, Dr. Jack Demick, in August 2005 found that she functioned within normal limits with respect to attention, executive function, motor functions, visuo-spatial functions, language and academic functions, and learning and memory. Tr. 394; see Tr. 391-98. This evaluation diagnosed major depression disorder, with mixed personality disorder (histrionic and narcissistic) and assigned a moderate GAF score of 50-55. [2] Tr. 398.

In February 2006, Plaintiff was evaluated again by Dr. Demick; this time he completed a mental residual functional capacity[3] ("RFC") questionnaire that reiterated his diagnosis of major depressive disorder and mixed personality disorder (with histrionic and narcissistic features). Tr. 480, 484, 509-10. While continuing to opine that Plaintiff "responded somewhat" to therapy and medication and ascribing a current GAF score of 50 (with highest GAF in the past year at 55), in the 2006 RFC, Dr. Demick inconsistently concluded that she would miss more than four days of work per month and is seriously limited in dealing with the stress of semiskilled and skilled work, interacting with the general public, maintaining socially appropriate behavior and meeting competitive standards for working in coordination or proximity to others. Tr. 483-84. By

---

[2] A Global Assessment of Functioning ("GAF") score of 41 to 50 indicates "serious symptoms," while one between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or coworkers)." See Diagnostic and Statistical Manual of Mental Disorders, Text Revision 32–34 (4th ed. 2000) ("DSM–IV–TR"). While use of GAF scores was commonplace at the time of Plaintiff's treatment, "[i]t bears noting that a recent [2013] update of the DSM eliminated the GAF scale because of 'its conceptual lack of clarity . . . and questionable psychometrics in routine practice.'" Santiago v. Comm'r of Soc. Sec., No. 1:13-CV-01216, 2014 WL 903115, at *5 n.6 (N.D. Ohio Mar. 7, 2014) (citing Diagnostic and Statistical Manual of Mental Disorders at 16 (5th ed. 2013) ("DSM–5").

[3] Residual functional capacity is "the most you can still do despite your limitations," taking into account "[y]our impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what you can do in a work setting." 20 C.F.R. § 404.1545(a)(1).

contrast to this assessment, his treatment notes from a few weeks later reflect his opinion that her current GAF had improved to 60, at the high end of the moderate range.  Tr. 508.

The state agency evaluations from the same time period disagreed with Dr. Demick's RFC.  For example, in July 2006, psychologist Dr. Lichtman's file review included examination of "the Demick PhD assessment [that] indicates a mixed Personality Dis, with histrionic and narcissistic traits;" he nevertheless found her moderately limited.  Tr. 614; see Tr. 602-18.  A consultant examination performed by psychologist Dr. Turchetta in July 2008, and a file review performed by psychologist Dr. Slavit in August 2008 both resulted in the same conclusion – that her mental conditions left Plaintiff moderately impaired.  Tr. 655-56, 659-75.

From June 2006 until June 2008, the record is silent on mental health treatment. Throughout this period, Plaintiff saw her primary care physicians at Miriam Hospital, mostly for HIV management and assorted physical ailments.  Aside from stressors related to divorce and caring for her son, the treatment notes show that she was generally "feeling quite well."  Tr. 627; see Tr. 625-35, 677-89, 873.

**C.  Mental Health History after August 18, 2008**

Plaintiff returned to mental health treatment beginning shortly before her fourth disability application was denied on August 18, 2008.  From June 2008 to January 2010, Plaintiff treated at West Bay Psychiatric Associates on a monthly basis, primarily with Brian Hickey, R.N., MSN, CS.  Tr. 708-23, 738-46, 810-17, 878.  Nurse Hickey's treatment notes indicate that Plaintiff's GAF was 60, with 64 as highest in the past year; he found her "clinically stable," with a "good response to meds;" most of her stress related to caring for her disabled son.  Tr. 708-23, 738-46, 810-17.  Plaintiff's primary care physician made similar observations, stating that her depression was "moderate" and managed by medication, and noting that Plaintiff reported "feeling pretty

well." Tr. 679, 873. In January 2010, Plaintiff stopped treatment with Nurse Hickey for several months, apparently because she lost her insurance, Tr. 878, but continued treatment with her primary care physician. The treatment notes record no concern over mental limitations: to the contrary, they state that "she has been doing well" and "[s]he is having less pain in her hand and feels she is almost ready to go back to driving a limousine as an occupation." Tr. 775, 783. Record references to the inability to work advert not to mental health difficulties but to her physical difficulties (carpal tunnel and foot and ankle pain). Tr. 775.

From June 2010 to December 2010, Plaintiff returned to treatment at West Bay Psychiatric Associates with Nurse Hickey. Tr. 708-23, 738-46, 810-17. On June 28, 2010, during one of her first visits back, Nurse Hickey completed a mental RFC questionnaire in which, despite assessing a GAF of 55-60, he opined that Plaintiff had an unstable mood, was "seriously limited" or "unable to meet competitive standards" for most mental skills required to perform unskilled work. Tr. 878-82. Nurse Hickey's RFC questionnaire concluded that Plaintiff was not capable of full-time or part-time employment due to anxiety and depression. Id. In contrast to Nurse Hickey's June 2010 opinion, Plaintiff reported to her primary care physician just two months later in August 2010 that "she has been feeling generally well." Tr. 836. In November 2010, Plaintiff told her primary care physician that "her depression is under excellent control" as a result of continuing with the medications previously prescribed. Tr. 834.

From December 2010 to June 2011, Plaintiff had another gap in mental health treatment, again due to insurance problems. Tr. 830. During this gap, in February and May 2011, her primary care physician noted that she was "going along smoothly," but she had not been able to return to work because of pain in her right hand and "because of continuing commitment of a

great deal of time dealing with" her son, but made no mention of mental limitations preventing her from work. Tr. 828-29. Overall, Plaintiff reported "feeling very well." Tr. 830.

On June 20, 2011, shortly after her attorney was notified that her hearing before the ALJ would take place in September, Tr. 126, Plaintiff apparently returned to mental health treatment with another practice called Psychological Centers; however, the only evidence in the record is a partially-completed intake form and an RFC questionnaire on a form provided by Plaintiff's counsel and completed on August 17, 2011, by Danielle DeSantis, Psy.D.[4] Tr. 818. On the RFC form, Dr. DeSantis wrote, "[i]ntake completed on 6/20/11 and wkly individualized sessions since . . . w therapist . . . [patient] also will see nurse practitioner for med maintenance . . . on Aug. 23 for 1st visit." Tr. 823. Otherwise, the file is devoid of evidence of any therapy, treatment, testing, evaluation or the use of any diagnostic tools by Dr. DeSantis or anyone else at Psychological Centers. Nevertheless, Dr. DeSantis' RFC diagnosed Plaintiff with major depressive disorder (single, moderate) and anxiety disorder (not otherwise specified) and opined that Plaintiff would miss more than four days of work per month due to her impairments and that her depression and anxiety would lead to loss of memory, difficulties with concentration and the inability to retain information and distractibility. Tr. 823-27. On many work functions, Dr. DeSantis found Plaintiff had "[n]o useful ability to function." Tr. 825. Inconsistently with other treating sources and Plaintiff's hearing testimony, Dr. DeSantis also found no limits on Plaintiff's ability to deal with supervisors and co-workers, checking "Unlimited or Very Good." Compare Tr. 42-44, 50-53, and Tr. 482, 880, with Tr. 825.

---

[4] The ALJ questioned Plaintiff regarding the dearth of records from Psychological Centers. Her attorney responded: "Whatever I got is in the file." Tr. 75.

II.    **Travel of the Case**

Plaintiff's current applications seeking DIB and SSI were filed on October 23, 2009.  Tr. 79, 155-63, 263.  In connection with these applications, on January 20, 2010, state agency psychologist Clifford Gordon, Ed.D., completed a psychiatric review technique form, finding that Plaintiff suffered from several disorders resulting in moderate limitation.  Tr. 751, 761.  In his RFC opinion, Dr. Gordon found that her alleged limitations were "partially credible" based on her psychiatric diagnoses of major depressive disorder, generalized anxiety disorder, social phobia, panic attacks and personality disorder (not otherwise specified).  Tr. 749.  Dr. Gordon opined that Plaintiff was "moderately limited" in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities as scheduled and be punctual, complete a normal workday and workweek, interact appropriately with the general public, respond appropriately to changes in a work setting, travel to unfamiliar places and use public transportation and set realistic goals or make plans independently of others.  Tr. 747-48.  He concluded that Plaintiff could "overall understand and remember tasks presented to her in the workplace," "has intact attentional skills for basic tasks with 1-2-3 consistent steps . . . can complete these type of tasks in two hour blocks of time over an eight hour day [but] . . . will have errors in concentration though on detailed, complex tasks," can "overall relate adequately with coworkers, supervisors, but not consistently with the public," "can follow through on basic tasks, but not complex abstract tasks in the workplace [and] . . . can adapt to ordinary changes in the work environment."  Tr. 749.

On May 11, 2010, Michael Slavit, Ph.D, reviewed the record on reconsideration, noting that Plaintiff alleged she had become "more snappy and her mood is worse" in the months following Dr. Gordon's January 2010 assessment.  Tr. 782.  Dr. Slavit reviewed "all the

ev[idence] in file" and affirmed Dr. Gordon's assessment, reasoning "there is no ev[idence] that would compel a recon reversal based on psych factors." Id.

The Commissioner denied Plaintiff's claims initially and on reconsideration. Tr. 79-82, 107-10, 112-17. Plaintiff asked for a hearing before an ALJ. Tr. 118. On September 6, 2011, the ALJ held a hearing at which Plaintiff (represented by counsel) and a vocational expert appeared and testified. Tr. 29-78. The ALJ then issued a decision finding that Plaintiff was not disabled from September 20, 2004, to September 21, 2011, the date of the ALJ's decision. Tr. 26. On January 14, 2013, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-5. Having exhausted her administrative options, Plaintiff filed this case. 42 U.S.C. § 405(g).

### III.     The ALJ's Hearing and Decision

At the hearing, Plaintiff's counsel asked the ALJ to reopen Plaintiff's prior applications because she had "a mental illness that prevented her from following through on everything;" he also argued that there was no evidence that Dr. Demick's RFC was reviewed in connection with the prior denials. Tr. 33-34; 73-75. Plaintiff's testimony focused on her daily living activities, mental and physical difficulties and the circumstances surrounding her departures from previous jobs. Tr. 34-56. Plaintiff testified that she was engaged, lived with her fiancé and disabled son and did not do many daily chores. Tr. 34, 48. She claimed difficulty with crowds, stress, work pressure, memory, concentration and performing complex tasks, as well as problems with co-workers and supervisors; she left her jobs at the fish store, home health and as a limousine driver and property manager because of arguments or other "turmoil." Tr. 36, 41, 43-44, 48, 51-52.

A vocational expert was called to testify and fielded two hypotheticals from the ALJ. Tr. 60, 61. In the first, the ALJ asked the vocational expert to assume that Plaintiff's testimony was

credible, including problems with crowds, inability to tolerate stress and work pressure, decreased memory, decreased concentration, inability to perform complex tasks and inability to work eight hours a day.  Id.  In response, the vocational expert testified no jobs would exist.  Tr. 61.  In the second, the ALJ asked the vocational expert to assume an individual with the same age, education and work experience as Plaintiff, limited to a stable work environment, performing simple, routine and repetitive tasks over an eight hour workday, with no more than simple decision making, no significant close interpersonal interactions with coworkers, no team work, no significant interaction with the public and no complex or detailed tasks.  Tr. 62.  Based on the second hypothetical, the ALJ testified that such an individual could perform jobs in assembly, inspection, production, machine tenders or security.   Tr. 64-68.

In response to cross-examination from Plaintiff's counsel, the vocational expert testified that if Dr. Slavic's mental RFC assessment from Plaintiff's 2008 application (the fourth application) was added to the mix and interpreted to mean that Plaintiff could not perform manufacturing tasks that are time pressured,[5] Plaintiff would not be capable of production jobs, but could still work in security.  Tr. 65-67.  Plaintiff directed the vocational expert to Dr. Demick's 2006 RFC, Nurse Hickey's 2010 RFC and Dr. DeSantis's 2011 RFC, and asked if any jobs would exist if, as they opined, Plaintiff could not work at least four days a month.  The vocational expert responded that there would be no jobs.  Tr. 70-75.

In his written decision, the ALJ first found that Plaintiff met the insured requirements of the Act through December 1, 2011.  Tr. 17.  He rejected Plaintiff's request to reopen the prior four applications, finding that "[t]here is no new and material evidence or other appropriate basis

_____

[5] Plaintiff's counsel and the ALJ sparred over the meaning of Dr. Slavit's phrase "not capable of tasks that are time pressured."  Tr. 65-66.  The vocational expert testified that Plaintiff's interpretation would mean no jobs, while the ALJ's interpretation would yield some work.  Tr. 67-68.

to justify reopening and revising that determination, which remains administratively final." Tr. 18. The ALJ rejected the suggestion that Dr. Demick's RFC opinion was somehow new and material evidence, finding that it was not new in that it had been considered by a state agency physician engaged for the third application, who did not accept its conclusions, and that it was not material in that it was inconsistent both with Dr. Demick's treatment notes indicating moderate limitations and with the opinion of a state agency psychologist who performed an examination of Plaintiff two years later. Tr. 22.

The ALJ then proceeded through the familiar five-step inquiry to determine the merits of Plaintiff's current (fifth) disability application. After concluding that Plaintiff was not engaged in substantial gainful activity at Step One, he proceeded to Step Two, finding the following severe impairments: HIV positive status, major depressive disorder, general anxiety disorder, panic disorder, a possible personality disorder, substance abuse disorder in reported remission, controlled restless leg syndrome, a history of mild right sided carpal tunnel syndrome mentioned in April 2009 with a negative EMC/NCS in 2010 and right lower extremity neuropathy. Tr. 18.

At Step Three, the ALJ found that none of Plaintiff's impairments met the criteria of any listed impairment. Id. With respect to Plaintiff's mental impairments, after consideration of the Listings related to 12.04 (Affective Disorders), the ALJ determined that Plaintiff did not meet or medically equal any of the listed impairments contained in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id. In making this determination, he relied on the record and Dr. Gordon's 2010 mental RFC assessment (and Dr. Slavit's affirmance), finding that Plaintiff had not established marked difficulties or repeated episodes of decompensation. Id.

The ALJ determined Plaintiff's RFC at Step Four. Tr. 18-24. Focusing carefully on Plaintiff's medical history, prior work, daily living activities and records from Plaintiff's prior

disability applications, the ALJ concluded that her medically determinable impairments could not reasonably be expected to cause the alleged symptoms to the degree alleged; this adverse credibility finding was based in part on discrepancies between her physical complaints and the activities reflected in the medical evidence.  Tr. 20.  For example, despite complaints of pain so severe she could not work as a limousine driver, Plaintiff injured herself while riding an off-road motorcycle.  Id.  The ALJ observed that Plaintiff's symptoms were well managed with medication and that the record showed she could participate in a full range of daily living activities, including part-time work.  Tr. 22.  Although Plaintiff alleged she could only work part-time because of her mental impairments, the ALJ noted that the record reflects statements to medical providers that she worked part-time to be with her disabled son.  Id.  The ALJ also found it significant that Plaintiff had several significant gaps in mental health treatment, the longest of which followed Dr. Demick's RFC and was not explained by her claim of loss of insurance coverage, undermining her allegations of disabling mental impairments.  Id.

The ALJ examined three opinions proffered by Plaintiff in support of her claim of mental disability.  First, at Plaintiff's request, the ALJ considered Dr. Demick's 2006 mental RFC opinion from Plaintiff's third application, despite its lack of direct relevancy to the period under consideration and noted the opinion's inconsistency with both Dr. Demick's own treatment notes and a contemporaneous state agency opinion, both of which reflect moderate limitations.  Id.  Moving to the current application, the ALJ afforded Dr. DeSantis's 2011 RFC no probative value because no treatment notes, testing or evaluation substantiated any aspect of the opinion; it appeared to be based only on Plaintiff's subjective allegations.  Further, the skimpy record supported the finding that Plaintiff had not developed a sufficient treating relationship with Dr. DeSantis.  Tr. 23.  Finally, the ALJ gave no significant probative value to Nurse Hickey's

opinion because he is not an accepted medical source, because his assessment was made shortly after Plaintiff resumed medication following a two-month lapse due to insurance problems, and because his RFC was inconsistent with the medical record, particularly with Nurse Hickey's own treatment notes both from the prior period ("clinically stable") and from a few months later ("stable – improved").  Tr. 22-23.

In making his RFC determination, the ALJ relied primarily on the RFC opinion of Dr. Gordon, affirmed by Dr. Slavit, and found that Plaintiff could perform light work as defined by 20 C.F.R. § 404.1567(b), with the following mental limitations:

> [L]imited to performing simple tasks, in a stable work environment, that require simple decision making; inability to have significant interaction with the public; inability to perform complex or detailed tasks; and no significant close interpersonal interaction with coworkers and inability to engage in team work.

Tr. 18-19.  Based on this RFC and testimony from the vocational expert, the ALJ concluded that Plaintiff is not capable of performing her past relevant work.  Tr. 25-26.  Nevertheless, at Step Five, the ALJ found that Plaintiff could perform jobs existing in significant numbers in the regional and national economies, such as assembler, inspector, production laborer and machine tender.  Id.  Accordingly, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act.  Tr. 16, 26.

## IV.   Issues Presented

Plaintiff presents three arguments:

1. The ALJ failed to provide any explanation for his finding that the prior applications, particularly the fourth, should not be reopened.

2. The ALJ erred by failing to give good reasons to reject the opinions offered by Drs. Demick and DeSantis and Nurse Hickey.

3. The ALJ's RFC determination is not supported by substantial evidence because, once the ALJ rejected the opinions of Drs. Demick and DeSantis and Nurse Hickey, (1) the only remaining opinions are from state agency sources, which the ALJ did not

evaluate or mention in his decision; and (2) the ALJ improperly interpreted raw medical data instead of calling a medical expert to testify.

## V.   **Standard of Review**

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – that is, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); Brown v. Apfel, 71 F. Supp. 2d 28, 30 (D.R.I. 1999).  Once the Court concludes that the decision is supported by substantial evidence, the Commissioner must be affirmed, even if the Court would have reached a contrary result as finder of fact.  Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (per curiam); see also Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991); Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981).

The determination of substantiality is based upon an evaluation of the record as a whole. Brown, 71 F. Supp. 2d at 30; see also Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).  Thus, the Court's role in reviewing the Commissioner's decision is limited.  Brown, 71 F. Supp. 2d at 30. The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the Commissioner.  Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148, 153 (1st Cir. 1989)).  "[T]he resolution of conflicts in the evidence is for the Commissioner, not the courts."  Id. at 31 (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)).  A claimant's complaints alone cannot provide a basis for entitlement when they are not supported by medical

evidence.  See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986); 20 C.F.R. §§ 404.1529(a), 416.929(a).

The Court must reverse the ALJ's decision on plenary review, if the ALJ applies incorrect law, or if the ALJ fails to provide the Court with sufficient reasoning to determine that the law was applied properly.  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam); accord Cornelius v. Sullivan, 936 F.2d 1143, 1145-46 (11th Cir. 1991).  Remand is unnecessary where all of the essential evidence was before the Appeals Council when it denied review, and the evidence establishes without any doubt that the claimant was disabled.  Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001) (citing Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985)).

The Court may remand a case to the Commissioner for a rehearing under Sentence Four of 42 U.S.C. § 405(g) when it finds that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim.  Seavey, 276 F.3d at 9; accord Brenem v. Harris, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).  Where the Court cannot discern the basis for the Commissioner's decision, a Sentence Four remand may be appropriate to allow an explanation of the basis for the decision.  Freeman v. Barnhart, 274 F.3d 606, 609-10 (1st Cir. 2001).  On remand under Sentence Four, the ALJ should review the case on a complete record, including any new material evidence.  Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council).  After a Sentence Four remand, the Court enters a final and appealable judgment immediately, and thus loses jurisdiction.  Freeman, 274 F.3d at 610.

## VI.    Disability Determination

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. §§ 404.1505, 416.905. The impairment must be severe, making the claimant unable to do previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-1511, 416.905-911.

## A.      Treating Physicians

Substantial weight should be given to the opinion, diagnosis and medical evidence of a treating physician unless there are good reasons to do otherwise. See Rohrberg v. Apfel, 26 F. Supp. 2d 303, 311 (D. Mass. 1998); 20 C.F.R. §§ 404.1527(c), 416.927(c). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. Konuch v. Astrue, No. 11-193L, 2012 WL 5032667, at *4-5 (D.R.I. Sept. 13, 2012); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275-76 (1st Cir. 1988). The ALJ's decision must articulate the weight given, providing "good reasons" for the determination. See Sargent v. Astrue, No. CA 11–220 ML, 2012 WL 5413132, at *7-8, 11-12 (D.R.I. Sept. 20, 2012) (where ALJ failed to point to evidence to support weight accorded treating source opinion, court will not speculate and try to glean from the record; remand so that ALJ can explicitly set forth findings).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical conditions at issue; and (6) other factors which tend to support or contradict the opinion.  20 C.F.R §§ 404.1527(c), 416.927(c).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. §§ 404.1527(d), 416.927(d).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's RFC (see 20 C.F.R. §§ 404.1545-1546, 416.945-946), or the application of vocational factors because that ultimate determination is the province of the Commissioner.  20 C.F.R. §§ 404.1527(d), 416.927(d); see also Dudley v. Sec'y of Health & Human Servs., 816 F.2d 792, 794 (1st Cir. 1987) (per curiam).

**B.      Developing the Record**

Social Security proceedings are "inquisitorial rather than adversarial."  Sims v. Apfel, 530 U.S. 103, 110-11 (2000); Miranda v. Sec'y of Health, Educ. & Welfare, 514 F.2d 996, 998

(1st Cir. 1975) (social security proceedings "are not strictly adversarial."). The ALJ and the Appeals Council each have the duty to investigate the facts and develop the arguments both for and against granting benefits. <u>Sims</u>, 530 U.S. at 110-11. The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel. <u>Evangelista</u>, 826 F.2d at 142. Courts in this Circuit have made few bones about the responsibility that the Commissioner bears for adequate development of the record. <u>Id.</u>; <u>see</u> <u>Deblois v. Sec'y of Health & Human Servs.</u>, 686 F.2d 76, 80-81 (1st Cir. 1982); <u>Currier v. Sec'y of Health, Educ. & Welfare</u>, 612 F.2d 594, 598 (1st Cir. 1980).

### C. Reopening Prior Disability Applications

The Commissioner has discretion to reopen a prior application claim for "any reason" within one year of the initial determination, and for "good cause" within four years of the initial determination. 20 C.F.R. § 404.988(a)-(b); <u>see</u> <u>Girard v. Chater</u>, 918 F. Supp. 42, 44 (D.R.I. 1996). Good cause exists when "[n]ew and material evidence is furnished," a clerical error is made in computing benefits or the evidence considered in making the determination "clearly shows on its face that an error was made." 20 C.F.R. § 404.989.

District courts ordinarily lack jurisdiction to review the ALJ's denial of a request to reopen because the decision is committed to the ALJ's discretion and does not constitute a final decision within the meaning of 42 U.S.C. § 405. <u>See</u> <u>Califano v. Sanders</u>, 430 U.S. 99, 104-07 (1977); <u>Gilbert v. Sullivan</u>, 48 F.3d 1211, at *1 (1st Cir. 1995) (per curiam); <u>Girard</u>, 918 F. Supp. at 44. An exception to the non-reviewability of reopening exists if the claimant presents a colorable constitutional claim in connection with the denial, such as a due process violation because the claimant has mental disabilities that prevent pursuit of further administrative review of an adverse determination. <u>See</u> <u>Udd v. Massanari</u>, 245 F.3d 1096, 1099 (9th Cir. 2001);

Gilbert, 48 F.3d 1211, at *1; Elchediak v. Heckler, 750 F.2d 892, 892-95 (11th Cir. 1985) (per curiam). However, this exception does not apply when the claimant was represented by competent counsel in connection with the prior application. See Sherrod v. Chater, 74 F.3d 243, 246 (11th Cir. 1996) (per curiam) (refusal to reopen not due process violation when mentally-challenged claimant was assisted by competent legal counsel).

An ALJ can reopen a case in two ways. First, he may make an express determination pursuant to 20 C.F.R. § 404.988 that the case should be reopened. Alternatively, the ALJ may "constructively" reopen the case by fully reconsidering the prior claim on its merits. Girard, 918 F. Supp. at 44. A prior disability claim is not deemed to have been reconsidered on the merits merely because the evidence reviewed by the ALJ includes evidence of the claimant's condition during the period covered by the previous application. Id. An ALJ "is entitled to consider evidence from a prior denial for the limited purpose of reviewing the preliminary facts or cumulative medical history necessary to determine whether the claimant was disabled at the time of his second application;" such review may also be necessary to determine whether there is "good cause" to reopen. Girard, 918 F. Supp. at 44-45 (quoting Frustaglia, 829 F.2d at 193). The ALJ's express refusal to reopen precludes a finding of constructive reopening, unless the ALJ's reconsideration on the merits is unambiguous. See Girard, 918 F. Supp. at 44-45.

### D.    Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled. 20 C.F.R. §§ 404.1517, 416.917; see also Conley v. Bowen, 781 F.2d 143, 146 (8th Cir. 1986). In fulfilling this duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an

examination is necessary to enable the ALJ to render an informed decision. <u>Carrillo Marin v. Sec'y of Health & Human Servs.</u>, 758 F.2d 14, 17 (1st Cir. 1985).

**E.      The Five-Step Evaluation**

The ALJ must follow five steps in evaluating a claim of disability. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920. First, if a claimant is working at a substantial gainful activity, the claimant is not disabled. 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, if a claimant does not have any impairment or combination of impairments that significantly limit physical or mental ability to do basic work activities, then the claimant does not have a severe impairment and is not disabled. <u>Id.</u> §§ 404.1520(c), 416.920(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Appendix 1, the claimant is disabled. <u>Id.</u> §§ 404.1520(d), 416.920(d). Fourth, if a claimant's impairments do not prevent doing past relevant work, the claimant is not disabled. <u>Id.</u> §§ 404.1520(e)-(f); 416.920(e)-(f). Fifth, if a claimant's impairments (considering RFC, age, education and past work) prevent doing other work that exists in the local or national economy, a finding of disabled is warranted. <u>Id.</u> §§ 404.1520(g), 416.920(g). Significantly, the claimant bears the burden of proof at Steps One through Four, but the Commissioner bears the burden at Step Five. <u>Wells v. Barnhart</u>, 267 F. Supp. 2d 138, 144 (D. Mass. 2003) (five step process applies to both DIB and SSI claims).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. <u>Davis v. Shalala</u>, 985 F.2d 528, 534 (11th Cir. 1993).

The claimant must prove the existence of a disability on or before the last day of insured status for the purposes of disability benefits.  Deblois, 686 F.2d at 79; 42 U.S.C. §§ 416(i)(3), 423(a), 423(c).  If a claimant becomes disabled after loss of insured status, the claim for disability benefits must be denied despite disability.  Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

**F.  Capacity to Perform Other Work**

Once the ALJ finds that a claimant cannot return to the prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the local or national economy.  Seavey, 276 F.3d at 5.  To meet this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant.  Allen v. Sullivan, 880 F.2d 1200, 1201 (11th Cir. 1989).  This burden may sometimes be met through reliance on the Medical-Vocational Guidelines (the "grids").  Seavey, 276 F.3d at 5.  Exclusive reliance on the grids is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors.  Id. (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements).  Exclusive reliance is not appropriate when a claimant is unable to perform a full range of work at a given RFC or when a claimant has a non-exertional impairment that significantly limits basic work skills.  Nguyen, 172 F.3d at 36. In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert.  Heggarty v. Sullivan, 947 F.2d 990, 996 (1st Cir. 1991).  It is only when the claimant can clearly do unlimited types of work at a given RFC that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy.  See Ferguson v. Schweiker, 641 F.2d 243, 248 (5th Cir. 1981).  In any event, the ALJ

must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given RFC indicated by the exertional limitations. Merola v. Astrue, C.A. No. 11-536A, 2012 WL 4482364, at *5 (D.R.I. Sept. 26, 2012).

### G.    Making Credibility Determinations

Where an ALJ decides not to credit a claimant's testimony, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  See Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986); Rohrberg, 26 F. Supp. 2d at 309-10.  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  See Frustaglia, 829 F.2d at 195.

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.  See Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995) (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983)).

## VII.    Application and Analysis

### A.    Reopening of Prior Applications

Before this Court, Plaintiff argues that the ALJ erred in declining to reopen any of Plaintiff's four applications, "especially the one that was denied on August 18, 2008," because he failed to explain the finding that they should not be reopened and because Dr. Demick's 2006 opinion constitutes new and material evidence sufficient to warrant reopening.  She contends that

Dr. Demick's opinion is new because there is no evidence it was ever reviewed during consideration of the third application even though it was part of that file. ECF No. 9-1 at 15-16. In addition, at the hearing, Plaintiff asked to reopen "because she has a mental illness that prevented her from following through on everything." Tr. 33.

The first two arguments may quickly be rejected. The ALJ's written decision expressly denied the request to reopen,[6] with the clear explanation that "[t]here is no new and material evidence or other appropriate basis to justify reopening and revising that determination, which remains administratively final." Tr. 18. Second, by noting that Dr. Demick's assessment was mentioned by a state agency reviewer from the third application,[7] the ALJ properly rejected the contention that Dr. Demick's opinion was overlooked and therefore is "new;" by noting its inconsistency with the contemporaneous record, the ALJ debunked the notion that it is material. Tr. 22. More important, however, is the limited reviewability of these findings in connection with the reopening determination. As a matter of law, only Plaintiff's third argument – that her mental illness prevented her from following through with the prior applications – presents concerns that may properly be considered by this Court.

District courts lack jurisdiction to review a denial of reopening unless the claimant presents a colorable constitutional claim, such as a mental disability that prevented pursuit of

---

[6] In light of the clarity of this finding, it is also clear that the ALJ did not constructively reopen by considering the evidence of Plaintiff's prior applications, by discussing Dr. Demick's 2006 opinion and reviewing record evidence prior to Plaintiff's last denial on August 18, 2008. See Girard v. Chater, 918 F. Supp. 42, 44 (D.R.I. 1996).

[7] Plaintiff contends the ALJ is wrong in finding that Dr. Demick's opinion was "previously considered by reviewing state agency physicians" based on speculation that, with two opinions from Dr. Demick in the record (the neuropsychological evaluation from 2005 and the RFC from 2006), only the 2005 evaluation, and not the 2006 RFC, was considered. Tr. 391-98; 480-84. Accordingly, she contends that the ALJ should have treated the 2006 RFC as "new and material." ECF No. 9-1 at 7. The record shows otherwise. State agency psychologist Dr. Lichtman's psychiatric review form from the third application states that "MER [medical evidence of record] consists of PPC records (8/05-2/06) . . . the Demick PhD assessment indicates a mixed Personality Dis, with histrionic and narcissistic traits." Tr. 614. Dr. Lichtman's description lines up apples to apples with Dr. Demick's 2006 opinion: "PPC" refers to PPC of RI, Dr. Demick's practice; his February 2006 RFC assessment is reflected in Dr. Lichtman's reference to "2/06." The ALJ's conclusion is well founded.

further administrative review of prior applications; however, this exception does not apply when the claimant was represented by competent counsel in the prior application.  See Califano, 430 U.S. at 104-07; Udd, 245 F.3d at 1099; Sherrod, 74 F.3d at 246.  Here, Plaintiff was not just represented by counsel on her third and fourth applications; she had the same attorney who is representing her now.  Tr. 89, 95, 99.  He was notified of the initial denial of the third application in December 2005, sent records to the Commissioner for reconsideration of the third application and received notice of denial of reconsideration in September 2006.  Tr. 83, 85, 96.  Plaintiff retained the same counsel for her fourth disability application on May 20, 2008; the initial denial was sent to him on August 21, 2008.  Tr. 87, 99-100, 104.  With competent counsel assisting with both the third and fourth applications, there can be no due process violation to justify this Court's review of the ALJ's denial of the request to reopen.

### B.      Treating Source Opinions of Drs. Demick and DeSantis and Nurse Hickey

Plaintiff argues that the ALJ failed to give "good reasons" for rejecting the opinions of Drs. Demick and DeSantis and Nurse Hickey.  Observing that treating source opinions should be ranked higher than examining and reviewing sources, and employing the flawed logic that they all said the same thing[8] so it must be true, Plaintiff contends that their assessments should have been afforded great weight.  See 20 C.F.R. § 404.1527.

The determination regarding the weight to give treating physician opinions is governed by 20 C.F.R. § 404.1527(c).  See generally Morales v. Comm'r of Soc. Sec., 2 F. App'x. 34, 36 (1st Cir. 2001) (per curiam) (ALJ had legally-sufficient basis to discount treating physician's opinion that was not corroborated by clinical findings and was refuted by rest of record evidence).  A treating physician's report may be discounted if it is conclusory, not based on

---

[8] In fact they do not say the same things.  Indeed, in material ways, the DeSantis RFC is different from those of Dr. Demick and Nurse Hickley.  Compare Tr. 482, and Tr. 880, with Tr. 825 (reflecting widely divergent views on Plaintiff's ability to get along with supervisors and co-workers).

clinical testing or is inconsistent with other substantial evidence in the record.  Konuch, 2012 WL 5032667, at *4-5.  In reviewing the ALJ's determination, this Court's role is limited: if the ALJ's approach is supported by substantial evidence, the permissibility of alternative interpretations is beside the point – it is not for this Court to reweigh the evidence or substitute its judgment for that of the ALJ.  Amaral v. Comm'r of Soc. Sec., 797 F. Supp. 2d 154, 162-63 (D. Mass. 2010).

The first of the two treating psychologists was Dr. Demick, whose 2006 opinion was written over two years before the denial of the fourth application.  Tr. 49; 480-84.  Plaintiff charges that the ALJ improperly relied on his own uneducated medical judgment when he interpreted Dr. Demick's GAF score of 50-55[9] as inconsistent with his opinion.  The record undermines the argument.  State agency psychologist Dr. Slavit, in connection with the fourth application, specifically stated that a GAF of 55 means "a degree of impairment as moderate," which is inconsistent with Dr. Demick's opinion that Plaintiff was "seriously limited."  Tr. 483-84; 675.  More fundamentally, the ALJ's decision shows that he gave good reasons not to reconsider Dr. Demick's stale opinion.  See 20 C.F.R. § 404.1527(c).  When compared to a somewhat more recent one, that of agency psychologist Dr. Turchetta, who performed diagnostic testing in July 2008 (in connection with the fourth application), its flaws are apparent, in that Dr. Turchetta's conclusions are in synch with Dr. Demick's treatment evaluation that Plaintiff was moderately impaired, but differ from Dr. Demick's RFC assessment of serious impairment.  Consistent with other records from Plaintiff's mental health history, both past and current, Dr. Turchetta noted Plaintiff's potential to improve as long as she remained in treatment.  Tr. 656.

The second treating psychologist to complete a form was Dr. DeSantis, whose August 17, 2011, RFC was written shortly before the hearing on Plaintiff's fifth application in September

---

[9] As noted supra, a GAF score of 55 indicates "moderate symptoms."

2011. Tr. 29, 823. Plaintiff challenges the ALJ's decision to give "no probative value" to the opinion simply because Plaintiff had just begun treatment with Dr. DeSantis, arguing that length of treatment is just one factor to be considered and that treating source opinions need not have treatment notes if the opinion is self-explanatory. The ALJ's written decision correctly observes that Dr. DeSantis not only has no treatment notes, but that there is also no evidence that any treatment occurred, apart from the RFC and a "very sparse intake evaluation conducted by another person." Tr. 23. The RFC indicates that treatment with respect to "med maintenance" had not yet begun. Id. The ALJ concluded that Dr. DeSantis based her opinion on Plaintiff's subjective allegations and "there is no reason why [Dr. DeSantis's] assessment would be valid for 12 continuous months or that the claimant will not improve with treatment." Id.

Substantial evidence supports the ALJ's approach to Dr. DeSantis's RFC. The medical record consistently shows that Plaintiff has moderate limitations as long as she receives medication; Dr. DeSantis formed her opinion based on Plaintiff's condition after she had gone untreated for six months and before she started medication maintenance. See Crosby v. Comm'r of Soc. Sec. Admin., 489 F. App'x 166, 168 (9th Cir. 2012) (proper to reject treating physician opinion when medical record shows claimant improved with treatment). That the intake form is "sparse" is also accurate; it is based on Plaintiff's subjective reporting, with answers to yes or no questions and a list of medications. Tr. 819-20. Dr. DeSantis's mental RFC form is more of the same – it is littered with statements like "clt . . . described intense anxiety," and "clt talked about drowsiness, fatigue, & lethargy that may affect her work performance," and "client's pain that she reports experiencing daily has a negative impact on her daily functioning and would also negatively impact her work performance." Tr. 823, 825. There is no evidence that Dr. DeSantis did testing, performed a mental status examination, or even treated Plaintiff (the report speaks of

treatment "w therapist" who is not named).  Tr. 823.  In short, the ALJ's conclusion that Dr. DeSantis had not formed an adequate treating relationship and simply gave an opinion based on subjective complaints is well supported.  See Rodriguez Pagan, 819 F.2d at 3 (treating source not entitled to controlling weight when it relies excessively on claimant's subjective complaints rather than objective medical findings).  There is no error in the conclusion to afford it no probative value.

The last of the three opinions is Nurse Hickey's 2010 evaluation.  For practitioners like Nurse Hickey, the ALJ's determination regarding weight is governed by 20 C.F.R. § 404.1513 and Social Security Ruling 06–03p; such opinions are not entitled to the controlling weight rule that applies to "acceptable medical sources" like psychologists.  See 20 C.F.R. § 404.1513; Faraone v. Colvin, No. CA 13-073 ML, 2014 WL 877064, at *4 (D.R.I. Mar. 5, 2014); Palmer v. Astrue, No. CA 06-468 M, 2008 WL 910060, at *4 n.13 (D.R.I. Mar. 31, 2008).  However, while the ALJ is not required to accept opinions from "other sources" like Nurse Hickey, Fantoni, 2008 WL 4693194, at *6 (D.R.I. Oct. 23, 2008), SSR 06–03p recognizes the increasing role of nurse practitioners in managed health care such that factors used to evaluate "acceptable medical source" opinions "can" be applied to opinions from "other sources."  See Faraone, 2014 WL 877064, at *4.

Plaintiff argues Nurse Hickey's opinion should be afforded the weight of that of a psychologist because it is consistent with and supported by the opinions of Drs. Demick and DeSantis.[10]  See 20 C.F.R. § 404.1527(c)-(d).  Plaintiff's argument is basically that Drs. Demick and DeSantis were right, so Nurse Hickey must be right too.  Having already dispatched the opinions of Drs. Demick and DeSantis, this argument does not move the meter.  In any event,

---

[10] Not entirely accurate – see n.8.

substantial evidence buttresses the ALJ's determination that Nurse Hickey's opinion is not supported by the medical record.  Tr. 23; 880-81.

Nurse Hickey opined that Plaintiff was "seriously limited" or "unable to meet competitive standards" for a wide variety of job-related mental skills.  Tr. 880-81.  As the ALJ points out, these findings were undercut by Nurse Hickey's own treatment notes that assessed Plaintiff as stable with medication and described her impairments as "mild."  Further undercutting the opinion are Plaintiff's reports to her primary care physician, just a few months later, that she was "feeling generally well," and that "her depression is under excellent control."  Tr. 834, 836.  The ALJ has discretion not to accept Nurse Hickey's medical opinion and was on solid ground in determining that Nurse Hickey's RFC was inconsistent with his treatment notes and other medical evidence.  Fantoni, 2008 WL 4693194, at *6 (no duty to accept "other source" opinions); see Cruz v. Astrue, CA 11-638M, 2013 WL 795063, at *15 (D.R.I. Feb. 12, 2013) (no error in discounting opinion inconsistent with treatment notes and other medical evidence around the same time).  The conclusion not to afford it any significant probative value is not error.

### C.      ALJ's RFC Determination

Plaintiff's final line of argument goes like this: after rejecting the opinions of Drs. Demick and DeSantis and Nurse Hickey, the ALJ created the mental limitations in his RFC determination "out of thin air" because his written decision has no discussion of any medical opinions that support his findings.  ECF No. 9-1 at 14.  Hence, the RFC determination is not supported by substantial evidence.  As a corollary, Plaintiff contends the ALJ should have called a medical expert to testify and substantiate the mental limitations outlined in his RFC.

This argument is belied by the record.  The ALJ's written decision states that he "adopted the clearer mental assessment of Exhibit 36F-3 [Dr. Gordon's opinion] from the current claim,

which the same Dr. Slavit affirmed." Tr. 26. The ALJ also explicitly considered Dr. Gordon's findings at the hearing. See Tr. 68-69 (ALJ states he "believe[s] my hypothetical is consistent with the more recent agency physician assessment, which is 36F [Dr. Gordon's assessment]."). The ALJ's reference to Dr. Gordon's opinion in his written decision and at the hearing is sufficient to demonstrate he considered and adopted it. See Grohoske v. Apfel, 17 F. App'x 893, 895 (10th Cir. 2001) (not error to fail to mention state agency doctors by name when claimant's mental state thoroughly examined by ALJ and state agency opinions consistent with ALJ's RFC determination); Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 8 (1st Cir. 1982) (finding no merit in claim that ALJ did not specifically discuss doctor's report, because ALJ quoted from other evidence that accurately summarized its contents). A comparison of the ALJ's mental RFC findings and Dr. Gordon's 2010 mental RFC opinion confirms that the RFC is well anchored in the opinion of a competent medical source.

Plaintiff's secondary attack appears to be based on the premise that the ALJ must rely on a medical opinion that lines up precisely with his RFC determination. Accordingly, she contends, there is not substantial evidence to support the ALJ's mental RFC because it differs from Dr. Gordon's in that Dr. Gordon opined that Plaintiff could get along with coworkers and supervisors while the ALJ found that Plaintiff should have "no significant close interpersonal interaction with coworkers." Tr. 19. The foundation for the difference is well explained by the ALJ in his decision: he credited Plaintiff's testimony "of prior difficulties working with supervisors and coworkers," and thus found a moderate degree of social impairment as related to teamwork. Tr. 24. The ALJ's departure from one aspect of a medical opinion, tweaking the limitations for the RFC finding based on Plaintiff's testimony and other record evidence, is hardly the stuff of reversible error. See Charpentier v. Colvin, C.A. No. 12-312 S, 2014 WL

575724, at *10 (D.R.I. Feb. 11, 2014) (RFC is determined by ALJ, citing 20 C.F.R. § 404.1546);

Brown v. Astrue, Civil Action No. 11-2461-JWL, 2012 WL 3644843, at *6 (D. Kan. Aug. 24,

2012) (ALJ not required to base limitations in RFC assessment solely upon medical evidence);

Reed v. Astrue, Civil Action No. 09-1395-JWL, 2011 WL 578740, at *9 (D. Kan. Feb. 9, 2011)

(proper for ALJ to use plaintiff's credible testimony to discount medical opinion on limitations).

The ALJ's reliance on Dr. Gordon is well founded and legally appropriate.  It must also

be noted that the ALJ surveyed the entire record and found that Plaintiff's daily activity level

was rather broad, only mildly limited by her affective disorder, that her mood and affect were

consistently described as within normal limits, that she responded well to treatment and

medication, and that she worked part-time not due to disability but because of her disabled son.

Tr. 21-22.  Viewed as a whole, the ALJ's RFC finding is consistent with, and well supported by,

the record.  Because the ALJ relied on substantial evidence for his RFC determination, Plaintiff's

argument that he should have called a medical expert fails.  See Bielefeldt ex rel. Wheelock v.

Astrue, No. 09 C 50302, 2011 WL 3360013, at *7 (N.D. Ill. Aug. 4, 2011) (lack of medical

expert testimony not error when evidence in record supports ALJ's findings).[11]

## VIII.  Conclusion

Because Plaintiff was represented by competent counsel, this Court has no jurisdiction to

review the ALJ's well-explained denial of Plaintiff's request to reopen her four prior

---

[11] In addition to her substantive arguments, Plaintiff takes a few jabs at the ALJ, complaining that he regularly uses the same mental limitations in most cases "regardless of the evidence presented," that he was extremely selective in citing evidence and ignored most of the record and that he frustrated Plaintiff counsel's cross-examination of the vocational expert. ECF No. 9-1 at 10-14.  These arguments can be rejected as quickly as they were made.  Plaintiff has submitted no evidence that the ALJ "routinely" uses the same mental RFC findings in other cases.  The Court is also at a loss as to how the ALJ ignored the record; to the contrary, he wrote a detailed twelve-page decision that does an exemplary job of describing the relevant portions of a record that itself is a lengthy and duplicative conglomeration of files from Plaintiff's current treatment and past applications.  See Rodriguez v. Sec'y of Health & Human Servs., 915 F.2d 1557, 1990 WL 152336, at *1 (1st Cir. Sept. 11, 1990) ("An ALJ is not required to expressly refer to each document in the record, piece-by-piece.").  Finally, while skeptical that opinions by Dr. Demick in 2006 and Dr. Slavit in 2008 had any relevancy because they were submitted with prior applications, the transcript shows that the ALJ afforded Plaintiff's counsel ample opportunity to cross-examine the vocational expert about them.  See Tr. 65-72.

applications. The Court further finds that the ALJ provided good reasons to disregard Dr.

Demick and to give minimal evidentiary weight to the opinions of Dr. DeSantis and Nurse

Hickey and that the ALJ's mental RFC determination is well supported by substantial evidence.

Accordingly, I recommend that Plaintiff's Motion to Reverse (ECF No. 9) be DENIED, that

Defendant's Motion to Affirm (ECF No. 11) be GRANTED and that final judgment enter in

favor of Defendant.

Any objection to this report and recommendation must be specific and must be served

and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting

party. See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d). Failure to file specific objections in a

timely manner constitutes waiver of the right to review by the district judge and the right to

appeal the Court's decision. See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008);

Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
March 27, 2014